**KENNEDY FOR PRESIDENT COMMITTEE and Edward M. Kennedy, Petitioners,**

v.

**FEDERAL ELECTION COMMISSION, Respondent.**

No. 83–1521.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 8, 1984.

Decided May 15, 1984.

William C. Oldaker, Washington, D.C., with whom David H. Larry, Washington, D.C., was on brief, for petitioners.

Richard B. Bader, Asst. General Counsel, Federal Election Commission, Washington, D.C., with whom Charles N. Steele, General Counsel and Miriam Aguiar, Atty., Federal Election Commission, Washington, D.C., were on brief, for respondent.

Before WALD, BORK and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge STARR.

WALD, Circuit Judge:

This case and the companion case decided today, *Reagan for President Committee v. Federal Election Commission*, 734 F.2d 1569, both present the issue of whether the Federal Election Commission (FEC or Commission) acted within its statutory authority under the Primary Matching Payment Account Act (the Act), 26 U.S.C. §§ 9031–9042, in ordering a candidate to repay to the government the full amount of his campaign's unqualified expenditures without regard to whether those expenditures were paid out of federal matching funds or private contributions. We find that the statute gives rise to a repayment obligation only when the FEC determines that federal matching funds were used for unqualified purposes, and limits the repayment obligation to the amount of federal matching funds that the Commission reasonably determines were used for such unqualified purposes. The Commission's regulation,

however, on its face and as applied to the Kennedy for President Committee in this case, indulges the unreasonable presumption that *all* unqualified expenditures are paid out of federal matching funds. We therefore reverse the Commission's order because it failed to make a reasonable determination of the amount of federal matching funds used by the Committee for unqualified purposes, and does not limit the Committee's repayment obligation to such an amount.

## I. BACKGROUND

On April 14, 1983, after lengthy administrative audits, the FEC determined that the Kennedy for President Committee (Committee) had exceeded the 1980 campaign expenditure limits by $14,889.17 in New Hampshire and $40,611.16 in Iowa.[1] Accordingly, the Commission found that the Committee had spent a total of $55,-500.33 for unqualified purposes during the 1980 campaign. Invoking and applying FEC repayment regulations, the Commission ordered the Committee to repay the full $55,000.33 to the United States Treasury.[2]

The Committee does not challenge the FEC's determination of the amount of unqualified expenditures. Rather, it contends

---

**1.** Under 26 U.S.C. § 9035, campaign expenditures are not "qualified" if they exceed certain spending limits, including limitations on spending in each state during the presidential primaries. *See Carter/Mondale Pres. Comm. v. FEC,* 711 F.2d 279, 280 n. 2 (D.C.Cir.1983). In this case, the FEC found that the Committee had exceeded the 1980 New Hampshire spending limitation ($294,400) by $14,889.17 and the 1980 Iowa limitation ($489,881) by $40,611.16. *See* FEC Statement of Reasons at 14, *reprinted in* Joint Appendix (J.A.) at 210.

The determination of the amount spent by a candidate in any given primary often involves a complex allocation of campaign expenditures—such as overhead, salaries, telephone and travel expenses—to a particular state, and the administrative audit in this case involved such an elaborate inquiry. *See* J.A. 1–167. Accordingly, the violation of campaign spending limitations is often, if not usually, inadvertent. No allegation has been made in this case that the Committee willfully or knowingly violated those limitations. *See Reagan Bush Comm. v. FEC,* 525 F.Supp. 1330, 1337 (D.D.C.1981) ("Repayment determinations are not considered to involve violations of law, but 'Criminal penalties are provided for willful violations constituting prohibited transactions.' ") (quoting H.Rep. No. 708, 92nd Cong., 1st Sess. 57 (1971) (Conference Report on Revenue Act)); *cf.* 26 U.S.C. § 9042 (criminal penalties for knowing and willful spending for unqualified purposes).

**2.** *See* FEC Statement of Reasons at 14–15 & n. 12, *reprinted in* J.A. at 210–11. The Commission contends that the Committee is precluded from raising the repayment formula issue on appeal because the Committee "fail[ed] to present a timely objection" during the administrative proceeding. FEC Brief at 17.

Generally, a reviewing court will refuse to hear claims that were not properly raised before the administrative agency. As the Supreme Court once explained, "Simple fairness ... requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

However, when the agency in fact considers the issue on the merits, this general exhaustion requirement can be satisfied even if the party did not properly raise it. *See, e.g., Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 682 & n. 10 (D.C.Cir.1983) (citing cases). While the FEC in its Statement of Reasons maintained that the repayment formula had been raised "more than one year out of time," Statement of Reasons at 3, *reprinted in* J.A. at 199, it nevertheless proceeded to address the issue on the merits, *see id.* at 14 & n. 12, *reprinted in* J.A. at 210–11.

Moreover, the Committee raised the repayment formula issue three months before the FEC made its final determination in this case. *See* Letter from William C. Oldaker to Charles N. Steele (Dec. 29, 1982), *reprinted in* J.A. at 182–84; *cf. Carter/Mondale,* 711 F.2d at 288–89 (candidate raised issue *after* final repayment determination). The FEC contends that the Committee raised the issue out of time under its regulations then in effect. While those regulations provided that the Committee would be "given an opportunity to submit in writing, within 30 days of receipt of the Commission's notice, legal or factual materials to demonstrate that repayment is not required," 11 C.F.R. § 9038.2(b) (1982), there was no express limitation that this 30-day period would be the *only* period during which a candidate could submit such materials if the Commission decided to take more than 30 days to issue a final decision. Indeed, the regulations specifically declared that "[t]he Commission will consider *any* written legal or factual materials submitted by the can-

that the Commission exceeded its statutory authority by ordering the repayment of the *entire* amount of those unqualified expenditures. According to the Committee, the Act requires the FEC to order repayment of only the amount of *matching funds* used for unqualified purposes. The Committee believes that the FEC is not authorized to demand repayment of the entire amount of unqualified spending. Instead, the Committee proposes that the repayment sum be calculated by "multiplying the total amount of unqualified expenditures by the proportion of matching funds to total campaign funds." Committee Brief at 16.

As explained below, we reverse the FEC's repayment order because it exceeds the FEC's authority under 26 U.S.C. § 9038. We hold that the statute requires the Commission to make a reasonable determination of the amount of *matching funds* used for unqualified purposes, and to limit its repayment order to that amount. However, because the statute does not prescribe a particular method for making the determination—while it does prescribe a method for determining the amount of *surplus* campaign funds to be repaid to the Treasury, *see* 26 U.S.C. § 9038(b)(3)—we believe that the Commission enjoys discretion in formulating a proper method for calculating the amount of unqualified expenditures attributable to matching fund

sources. We therefore do not think that the Committee's proposed method should be judicially mandated as the sole acceptable formula for calculating repayment obligations. At the same time, we think it is clearly unreasonable to presume that 100 percent of unqualified expenses are fairly attributable to federal matching funds. Accordingly, we reverse the FEC order and remand for further proceedings consistent with this opinion.

## II. DISCUSSION

■ The relevant section of the Act provides:

> If the Commission determines that any amount of any payment made to a candidate from the matching payment account was used for any purpose other than ... [qualified campaign expenses,] it shall notify such candidate of the amount so used, and the candidate shall pay to the Secretary an amount equal to such amount.

26 U.S.C. § 9038(b)(2). By its terms, therefore, the statute creates a repayment obligation only "[i]f the Commission determines" that matching fund payments were used for unqualified purposes, and expressly limits the repayment obligation to "such amount," *i.e.*, the amount of matching funds "so used." Because nothing in the legislative history suggests that Congress

didate in making its final determination." 11 C.F.R. § 9038.2(c) (1982) (emphasis added). Accordingly, the regulations might be read to require that the Commission accord the candidate at least a 30-day period before a final decision is rendered, during which the candidate could submit comments and raise issues. Nothing in those regulations provided that issues could not be raised after the 30 day period if the Commission had not yet rendered its decision. We note that the Commission has recently revised its procedural rules to clarify that a candidate *must* raise a disputed issue within the 30-day period. *See* 11 C.F.R. § 9038.-2(c) (1983).

We think that the above factors, taken together, satisfy the exhaustion requirement. In its brief, however, the FEC argues that this court's decision in *Carter/Mondale, supra,* controls this case, and that therefore the Commission's determination should be allowed to stand regardless

of whether its substantive legal basis is sound. *See* FEC Brief at 13–15. However, *Carter/Mondale* does not control this case. In *Carter/Mondale,* this court refused to assume jurisdiction because the candidate had failed to bring an appeal within 30 days of the Commission's final action, as required by statute. *See Carter/Mondale,* 711 F.2d at 280, 289–91; 26 U.S.C. § 9041(a) (petition for review must be filed "within 30 days after the agency action by the Commission for which review is sought"). In this case, by contrast, there is no question that the statutory prerequisites for judicial review have been met. Instead, the Commission seeks to prevent judicial review on the grounds that administrative remedies were not exhausted. As we explained above, however, the exhaustion doctrine does not preclude review under the circumstances of this case.

intended any other result, we interpret the statute in accordance with its straightforward meaning.

The FEC regulations, by contrast, require repayment of "any payment made to a candidate from the matching payment account *or any contributions received by the candidate*" used for unqualified purposes. 11 C.F.R. § 9038.2(a)(2) (1982) (emphasis added).[3] Thus the regulations require repayment of unqualified expenditures regardless of whether the expenditures could properly be attributed to federal matching fund payments.[4] We believe that if Congress had intended the *total* amount of every unqualified expenditure to be repaid, the statute would not have expressly limited the repayment obligation to unqualified expenditures paid out of matching fund sources.

■ Instead, the statute contemplates a "Commission determin[ation]" that the sum to be repaid equals the "portion of [the] payment[s] made to a candidate from the matching payment account [that] was used for" unqualified purposes. 26 U.S.C.

§ 9038(b)(2). Since federal funds and private contributions are commingled in the candidate's coffers, this determination may never be perfectly accurate. Nevertheless, the statute delegates to the Commission the task of estimating the amount of federal funds, rather than private contributions, that were spent for unqualified purposes. By requiring repayment of 100 percent of the amount of all unqualified expenditures, without at least estimating the extent to which such expenditures derived from matching fund sources, the Commission has shirked its statutory responsibility to make a reasonable determination that the repayment sum represents the matching funds used for unqualified purposes. After all, matching funds do not comprise even *fifty* percent of total funds in *any* campaign.[5] For this reason, we believe the regulation and the order in which the Commission applied that regulation, *see FEC Statement of Reasons* at 14 n. 12, *reprinted in* Joint Appendix (J.A.) at 210, exceed the FEC's statutory authority under 26 U.S.C. § 9038(b)(2).[6]

The FEC believes that well-established rules of statutory construction support its

---

**3.** In 1983, the Commission revised its repayment regulations. However, no substantive change was made in the repayment formula at issue in this case. *See* 11 C.F.R. § 9038.-2(b)(2)(i) (1983).

**4.** As the Commission has acknowledged, its existing regulations could conceivably result in the repayment of a greater sum of money than the candidate received in federal matching payments. *See* Letter to the Panel from Richard B. Bader, Assistant Gen. Counsel for FEC (Feb. 9, 1984).

**5.** In determining the amount of matching fund payments to which an eligible candidate is entitled, the Commission must disregard "any amount of contributions from any person to the extent that the total of the amounts contributed by such person ... exceeds $250" during the relevant period. 26 U.S.C. § 9034(a); *see* 11 C.F.R. § 9034.2(a)(2) (1983). Also, numerous kinds of receipts are not "matchable," such as cash contributions, credit card transactions, in-kind contributions, and contributions made before the matching payment period begins. *See* 11 C.F.R. §§ 9034.2, 9034.3 (1983). *See generally* FEC, *Financial Control and Compliance Manual for Presidential Primary Candidates Receiv-*

*ing Public Financing* I–34 (rev. ed. Feb. 1983). As a result, matching payments will never truly "match" all private campaign contributions, and will usually constitute significantly less than fifty percent of the candidate's total funds.

**6.** The statute authorizes the FEC to recoup only an amount "equal to" the federal monies spent for unqualified purposes; it therefore mandates not only the "repayment of the amount of federal matching funds used for unqualified expenditures," Diss.Op. at 1567, but also that the repayment amount *be limited to that amount.* Thus, we cannot agree with the dissent's notion that "by requiring repayment of the entire amount of unqualified expenditures, [the rule] ensures that this [statutory] mandate is achieved." *Id.* Instead, we believe the FEC rule runs counter to the statute because it requires repayment without even attempting to determine how much of the unqualified expenditure came out of federal matching payments.

Accordingly, we think this case presents a quite different circumstance from *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981). In *DSCC,* the Supreme Court deferred to the agency's statutory interpretation only after first finding that the statute did "not expressly or by implication"

interpretation of section 9038(b)(2). As the Commission reminds us, the Act specifically requires candidates at the end of a campaign to repay out of their surplus funds "that portion of any unexpended balance ... which bears the same ratio to the total unexpended balance as the total amount received from the matching payment account bears to the total of all deposits made into the candidate's accounts." 26 U.S.C. § 9038(b)(3). In contrast, the statute provides no specific formula for the repayment of amounts used for unqualified purposes. *See id.* § 9038(b)(2). In light of "the presumption that 'where Congress includes particular language in one section of a statute but omits it in another section of the same Act, ... Congress acts intentionally and purposely in the disparate inclusion and exclusion,'" FEC Brief at 25 (quoting *United States v. Martino*, 681 F.2d 952, 954 (5th Cir.1982) (en banc) (citations omitted)), the Commission argues that the Committee's proposed repayment formula, *see supra* at 1561—which is identical to the formula specified in the statute for surplus repayments—should not be mandated for repayments of unqualified expenditures, for which Congress specified no particular formula.

■ We agree with the FEC that section 9038(b)(2) mandates no particular re-

payment formula, but we do not agree that the FEC's repayment scheme is therefore within the bounds of the statute's delegated authority. The statute's silence as to the proper repayment formula for unqualified expenditures, read alongside its quite definite mandate of a particular repayment formula for surplus funds, manifests a discernible congressional intent to accord to the FEC discretion in the formulation of a method for determining the repayment obligations of candidates who have used matching funds for unqualified purposes. Such leeway, however, does not authorize the FEC to abandon its responsibility to arrive at some reasonable method for determining the extent to which matching funds, rather than private contributions, were used for unqualified purposes. We think it to be patently *unreasonable* for the FEC to assume, as it did in this case, that *all* unqualified expenditures were paid out of matching funds. Thus, the principle of statutory interpretation invoked by the FEC, properly applied, justifies only an inference that Congress afforded to the FEC discretion to devise a formula for determining repayment obligations due to unqualified expenditures. This discretion, however, does not legitimate such a clearly unreasonable formula as the one used by the FEC in this case.[7]

■ Finally, we note that the Commission's express rationale for its repayment

forbid the agency action under review. 454 U.S. at 39, 102 S.Ct. at 46, *see id.* at 36, 102 S.Ct. at 44. In this case, by contrast, the statute plainly allows the Commission to take back only the amount of *federal funds* used for unqualified purposes, and the Commission's rule clearly exceeds that limitation. Our decision today therefore does not reject a "sufficiently reasonable" interpretation of the statute in favor of a construction we think best. *Cf.* Diss.Op. at 1568. It merely vacates an agency order—perhaps supportable as a matter of pure policy—that does not comport with the plain language of section 9038.

7. The Commission argues that Congress affirmatively sanctioned the repayment regulations by failing to override the regulations when they were transmitted to Congress pursuant to the legislative veto provisions contained in the Act. *See* 26 U.S.C. § 9039(c). Given the clear indications in the Act that repayments should be limit-

ed to the amount of matching funds used for unqualified purposes, *see supra* at 6–8, we do not believe that the simple existence of a legislative veto provision should immunize an agency from challenges that its action oversteps its statutory authority. After all, almost 300 statutes contain such legislative veto provisions, *see INS v. Chadha*, —— U.S. ——, ——, 103 S.Ct. 2764, 2781, 77 L.Ed.2d 317 (1983), and we do not believe that Congress' *failure* to exercise its purported authority under one of those provisions should be taken as conclusive evidence of congressional approval. While the interpretation of a statute by an agency charged with its administration is entitled to deference, and inaction by Congress may sometimes be an "indication that Congress does not look unfavorably" upon an administrative regulation, *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 34, 102 S.Ct. 38, 43, 70 L.Ed.2d 23 (1981), reviewing courts "must reject administrative constructions of the statute, whether reached by

formula fails adequately to support its action. In promulgating the repayment rule, the FEC said:

> If a candidate spends private campaign contributions ... on nonqualified campaign expenses, those private funds would obviously not be available to defray the candidate's qualified campaign expenses. The net result would be that the candidate would subsequently require more public funding to meet his or her qualified expenses. In essence, this additional public funding would restore private campaign funds diverted by the candidate to nonqualified campaign purposes. Such an outcome would be equivalent to permitting a candidate to use matching funds to defray nonqualified campaign expenses.

44 Fed.Reg. 20336 (Apr. 4, 1979). The Commission offers this very same rationale in support of its action in this case. See FEC Brief at 17–19. While the FEC's rationale is not entirely clear,[8] this passage appears to argue that an unqualified expenditure depletes the candidate's total campaign funds available for qualified spending, and that therefore the final "net result" of the unqualified expenditure will be the spending of federal funds that would not have been spent absent the unqualified expenditure. Of course, an unqualified expenditure, like any other expenditure, will reduce the campaign's overall available funds, and thus cause more federal monies to be spent than otherwise would have been spent.[9] The relevant question, however, is *how much* extra federal money be spent as a result of the unqualified expenditure?

Certainly, it would be unreasonable to think that *all* the extra spending would be paid out of federal funds. After all, the candidate's qualified expenditures are paid out of the commingled pool of federal and private monies. It is therefore not plausible to presume that the additional money spent as a result of an unqualified expense is comprised entirely of federal money.

█ In fact, the true "net result" of the depletion of the overall campaign fund will be either an increase in the campaign's final deficit or a decrease in the campaign's final surplus. In the case of a deficit, the total federal funds would have been spent

---

8. The FEC also appears to argue that it may compel repayment of private funds spent for unqualified purposes because, according to the Commission, the expenditure of private funds causes the candidate to receive "additional public funding," and therefore the use of private money for unqualified purposes is "equivalent" to the use of federal funds (subject to repayment) for those purposes. Unqualified expenditures, however, do *not* increase federal matching payments to the candidate who incurs them. Federal matching payments do *not* "restore private campaign funds diverted ... to nonqualified campaign purposes," 44 Fed.Reg. 20336, nor do they "replenish the pool for the funds which have been paid out," FEC Brief at 18. Neither does a candidate who incurs unqualified expenses "require more public funding to meet his or her qualified expenses." 44 Fed. Reg. 20336. Rather, the level of federal matching payments to a candidate is determined *solely* by the level of private "matching contributions"

adjudication or by rulemaking, that are inconsistent with the statutory mandate," *id.* at 32, 102 S.Ct. at 42.

to that candidate. See 26 U.S.C. § 9034(a); 11 C.F.R. § 9034.2. A candidate's entitlement to a given level of public matching funds therefore in no way depends on how much that candidate spends, or whether that spending includes unqualified expenditures. Thus, we do not find this argument at all convincing, because unqualified expenditures do *not* cause additional federal monies to flow to the candidate's coffers. We find it considerably difficult to understand, then, why an expenditure, paid out of a pool of funds at least half of which was comprised of *private* money, should be deemed to have been comprised solely of *federal* money.

9. If the Commission's rationale were valid, *all* campaign funds could be deemed federal funds on the ground that any expenditure would require more federal funds to "replenish" the campaign's coffers. This result, of course, is absurd and utterly dissolves the distinction, recognized by the statute, see supra at 6–8, between expenses paid out of matching funds and expenses paid out of private contributions.

regardless of the unqualified expenditure.[10] In the case of a surplus, the government is entitled to recover only its *pro rata* share of the final campaign surplus. *See supra* at 1562–63. Accordingly, insofar as the FEC's repayment formula for unqualified expenditures looks to the "net result" of the unqualified expenditures, *see* 44 Fed.Reg. 20336, it appears that a *pro rata* formula, such as the one proposed by the Committee, would be reasonable. However, in view of the discretion afforded to the FEC by the Act, *see supra* at 1563, and the evident wisdom of permitting the Commission to devise for itself a formula suited to the unqualified expenditures area,[11] we do not believe that the FEC *must* employ the *pro rata* formula suggested by the Committee.

Finally, the Commission suggests that its repayment formula merely "recoups [the] money expended by the candidate in violation of conditions he or she voluntarily assumed in order to receive the matching funds." FEC Brief at 20 n. 13. However, while the Act imposes spending limits on the candidates, *see* 26 U.S.C. § 9035, the remedy prescribed under the administrative audit procedure is the repayment of the amount of *federal money* spent for unqualified purposes, *not* the total amount of unqualified expenditures. As explained *su-*

*pra* note 1, often a candidate may violate spending limitations inadvertently and against his own intentions. When a candidate knowingly and willfully violates the spending ceilings, more serious penalties may be imposed so long as more elaborate procedural safeguards are respected. *See* 2 U.S.C. § 437g; 26 U.S.C. § 9042; *see also Reagan Bush Committee v. FEC*, 525 F.Supp. 1330, 1337 (D.D.C.1981) ("Repayment determinations are not considered to involve violations of law, but 'Criminal penalties are provided for willful violations constituting prohibited transactions.' ") (quoting H.Rep. No. 708, 92d Cong., 1st Sess. 57 (1971) (Conference Report on Revenue Act)). Thus, when the FEC orders repayment pursuant to an administrative audit, the statute authorizes the agency to "recoup" only *the federal funds* spent for unqualified expenditures; when more serious violations have occurred, more extensive penalties are available to deter deliberate wrongdoing.

## III. CONCLUSION

For the reasons set forth above, we vacate the order of the Commission and remand for further proceedings consistent with this opinion.

*So ordered.*

---

**10.** If the deficit were smaller than the unqualified expenditures, then this statement would not be true. In such a rare case, the campaign would have run a surplus in the absence of the unqualified expenditure. The government then could have recovered its *pro rata* share of the resulting surplus. Therefore, the FEC's rationale would still justify at most a *pro rata* repayment formula, insofar as the formula looks to the overall "net result" of the unqualified spending. *See infra.*

**11.** Obviously, since federal matching funds and private contributions are commingled in the campaign fund, the FEC cannot make an absolutely accurate estimate of the amount of matching funds used for unqualified purposes. Members of Congress and a former general counsel to the FEC have recognized, however, that the *pro rata* surplus repayment formula recovers "all unused funds that [the candidate] got through the Government source as a match-

ing source." *Legislative History of the Federal Election Campaign Act Amendments of 1976* 170 (remarks of Sen. Cannon); *see id.* (remarks of then-General Counsel Murphy of the FEC) (the surplus repayment formula ensures "[r]epayment of all of the moneys left over"). It might therefore be reasonable to assume that such a *pro rata* formula would recover all federal funds spent for unqualified purposes.

However, other considerations particular to the repayment of unqualified expenses might warrant a different administrative approach. For example, the FEC might look to the ratio of federal funds to private contributions in the candidate's campaign fund *at the time the expense was incurred* rather than during the entire campaign. On remand, the Commission may address such questions in the exercise of its expertise and discretion recognized by the Act.

**1566**

STARR, Circuit Judge, dissenting:

With respect, I am unable to join the majority's opinion reversing this order.[1] While this is, in my view, a close case, the Commission's position regarding repayments of unqualified expenditures by campaign committees is neither contrary to law nor "patently *unreasonable.*" Majority Opinion at 8 (emphasis in original). This court owes deference to the Commission's construction of the statute; it should not, even if its interpretation reflects the better view, "interpret the statute as it thinks best." *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981) [hereafter *DSCC*].

*DSCC* provides us with the principal learning as to the methodology we are to employ in walking through the labyrinthine precincts of this complex statute, the wording of which partakes of the same qualities found in the Internal Revenue Code. In *DSCC*, the Supreme Court upheld an FEC regulation promulgated under the Federal Election Campaign Act, 2 U.S.C. §§ 431–55 (1982) ("FECA"). That regulation permitted state committees of political parties to designate the national senatorial campaign committee of that party as its agent for making certain expenditures. *Id.* at 42–43, 102 S.Ct. at 47–48. In upholding the regulation, the Court first recognized the well established principle that "[t]he interpretation put on the statute by the agency charged with administering it is entitled to deference, ... but [that] the courts are the final authorities on issues of statutory construction." *Id.* at 31–32, 102 S.Ct. at 42 (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965)). According to the *DSCC* Court, courts "must reject administrative con-

structions of statutes ... that are inconsistent with the statutory mandate or frustrate the policy that Congress sought to implement." *DSCC*, 454 U.S. at 32, 102 S.Ct. at 42. Thus, before determining whether an agency's construction of a statute is entitled to deference, a reviewing court must first decide whether the construction is inconsistent with the statute. In *DSCC* after concluding that the FEC's construction did not exceed its statutory authority under FECA, the Court analyzed whether the Commission's construction was entitled to deference. This inquiry, although obviously intertwined with the question whether the construction comports with the mandate of the statute, is nonetheless distinct. It requires an examination of the "thoroughness, validity, and consistency" of the agency's decision. *Id.* at 37, 102 S.Ct. at 45.

The first, and most critical, inquiry under *DSCC*, therefore, is whether the FEC's regulation is inconsistent with the language or the policies of the Presidential Primary Matching Payment Account Act ("the Act"). 26 U.S.C. §§ 9031–41 (1982). The majority concludes that the "straightforward meaning" of section 9038 expressly limits the repayment obligation for unqualified expenditures to the amount of *federal matching funds* used for such unqualified expenditures. Maj.Op. at 1561. The FEC's regulations under this provision, in contrast, require repayment of "any payment made to a candidate from the matching payment account or any contributions received by the candidate" that are used for unqualified expenditures. 11 C.F.R. § 9038.2(a)(2) (1982). Thus, the majority reasons, not without force, that the regulations' requirement that the entire amount of unqualified expenditures be repaid goes beyond and thus conflicts with the statuto-

1. I do, however, agree with the majority's conclusion that this court is not precluded from addressing the merits of the repayment formula issue. Maj.Op. at n. 2. As the majority observes, the Commission in fact considered the issue as to the Committee after it raised the issue months before the final determinations were made. Further, the regulations in effect at the time did not provide an express limitation on the timing of such objections. Under such circumstances, this court properly may address the merits of the Committee's claims.

ry mandate. That perceived conflict is created by the regulations' allowing the FEC to "shirk its statutory responsibility to make a reasonable determination that the repayment sum represents the matching funds used for unqualified purposes." Maj.Op. at 1562. In a word, the majority reads the plain language of the statute to forbid the Commission's dragnet approach.[2]

The FEC's regulation, in my view, contravenes neither the Commission's statutory authority nor the policy sought to be implemented by Congress through that statute. First, section 9038, by its terms, does not forbid the Commission from requiring repayment of all non-qualified expenditures. Rather, the precise requirement of section 9038 is to mandate repayment of the amount of federal matching funds used for unqualified expenditures. The Commission's regulation, by requiring repayment of the entire amount of unqualified expenditures, ensures that this mandate is achieved. We will return to this point in a moment in examining the difficulty of *full* compliance with the statute unless the Commission's interpretation here is followed.

Second, a venerable rule of statutory construction assists the Commission in its interpretation. While such rules are simply aids to understanding, and are emphatically not to be viewed as rigid and unyielding principles, the common sense and experience embodied in such precepts can helpfully illuminate the otherwise dark path toward determining legislative intent. One such rule is that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, ... Congress acts intentionally and purposefully in the disparate inclusions and exclusions." Maj.Op. at 1563. This principle suggests that Congress knew what it was doing when it elected not to incorporate in the provision before us the allocation formula found *elsewhere* in the statutory scheme and enthusiastically embraced for adoption by the Kennedy Committee. This further suggests that the FEC's refusal to apply the proportional formula advocated by the Committee is consistent with the Act. Another provision in the statute, section 9038(b)(3), which governs repayment of surplus matching funds after the primaries have concluded, requires that the amount of surplus funds attributable to matching funds be calculated pursuant to the proportion of federal funds to private funds received by a candidate. If Congress had intended the application of the repayment formula sought by the Committee and apparently approved by the majority, Maj.Op. at 1563–64, it presumably would have so specified in that statutory provision.

The majority, however, suggests that Congress' failure to use here the same formula that governs recapture of surplus funds merely evidences its intent to give the FEC *discretion* to devise an appropriate method of computing the amount of federal funds used for unqualified expenditures. But it is difficult to see what other approach might be taken by the FEC than to transplant the allocation formula from the surplus funds provision. Both the Commission and the Committee acknowledge that the commingling of private and federal funds precludes tracing to determine which federal funds were used for unqualified expenditures.[3] Thus, the majority's suggestions to the contrary not-

---

**2.** A unanimous Supreme Court has recently reminded us that the force of a literal reading of a statute does not sweep away all other factors and considerations that properly obtain in the construction of statutes. *Heckler v. Edwards,* —— U.S. ——, ——, 104 S.Ct. 1532, 1537–38, 79 L.Ed.2d 878 (1984).

**3.** *See* FEC Brief at 23; *Reagan for President Committee v. FEC,* 734 F.2d 1569, Joint Appendix 177–180 (letter from Arthur Young & Co. to Mr. Ronald E. Robertson) (recognizing that commingling of private and federal funds renders it impossible to determine whether federal or private funds were used for unqualified expenditures and suggesting that, if the FEC's approach were not followed, proportional formula would be the only practicable alternative).

withstanding, the only practicable alternative to the Commission's approach appears to be the Committee's proportional approach. Yet, as we have seen, Congress did not specify this proportional formula which it mandated for another use. The Commission's construction of the statute thus avoids rendering the exclusion of the proportional formula in section 9038(b)(2) a nullity.

Third, and related to the point just discussed, the FEC promulgated this regulation pursuant to the procedures of informal rulemaking. When the Commission submitted the regulation to Congress pursuant to section 9039, neither House expressed disapproval. Although the Supreme Court has, subsequent to the promulgation of this regulation, invalidated a comparable legislative veto provision, *INS v. Chadha,* —— U.S. ——, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), *Chadha* does not diminish the meaning of such indications of congressional intent with respect to these regulations. In fact, the Court in upholding an FEC regulation in *DSCC* relied explicitly on the absence of congressional disapproval in the review process. 454 U.S. at 34, 102 S.Ct. at 43. Thus, the clear "indication that Congress does not look unfavorably," *id.,* upon the regulation at issue here further strengthens the Commission's interpretation.

Finally, the FEC's repayment requirement furthers the purposes of the Act by discouraging candidates from exceeding statutory limits on campaign expenditures in each State. *See* 2 U.S.C. § 441a(b)(1)(A) (specifying campaign expenditure limits for presidential primaries). As this court observed in *Carter/Mondale Presidential Committee v. FEC,* 711 F.2d 279, 280 n. 2

(D.C.Cir.1983), most such unqualified expenditures result from exceeding these spending limits. By imposing these repayment requirements, the regulation in effect deems all unqualified expenditures to be from federal matching funds rather than from private sources.[4] The regulation is thus aimed at remedying the situation where a candidate, prior to establishing eligibility for federal matching funds under section 9033, spends private funds on unqualified expenditures. Subsequent to qualifying for funds, the federal matching funds become available and the candidate thus has the use of federal funds that he or she will later be required to repay by virtue of their expenditure for unqualified purposes. *See id.* The regulation discourages such practices—including the practice of front-loading unqualified expenditures in the early caucus or primary States, such as Iowa and New Hampshire—by ensuring that the candidate will repay the full amount of unqualified expenditures.[5]

As we have noted, the amount of deference given to an agency's construction of a statute depends upon the thoroughness, validity, and consistency of an agency's reasoning. *DSCC,* 454 U.S. at 37, 102 S.Ct. at 45. In deciding whether the construction should be upheld, our inquiry is the narrow one of whether the Commission's construction "was 'sufficiently reasonable' to be accepted by a reviewing court." It is not the court's best reading of the statute that governs. Thus, as the Supreme Court observed in *DSCC,* "[t]o satisfy this standard, it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 39, 102 S.Ct. at 46.

---

**4.** *See* 44 Fed.Reg. 20,336 (1979) (explaining that purpose of requirement is to prohibit "candidate who accepts public funding from using private contributions received after becoming a candidate including those received prior to establishing eligibility, for expenses which are not qualified campaign expenses").

**5.** The majority notes that the Commission's regulation could result in requiring repayment of

more than the total amount of matching federal funds. Maj.Op. at n. 4. With all due respect, this concern is not presented by this case. Moreover, the situation in which unqualified expenditures would exceed total federal matching fund payments would seem highly unlikely to arise at all.

The majority passes over these admonitions and instead construes the statute as it thinks best. To be sure, the majority's interpretation is entirely sensible and has the not inconsiderable benefit of preventing an FEC "windfall" in recovering funds beyond those federal monies disbursed for unauthorized expenditures. Nonetheless, as the *DSCC* Court emphasized, the FEC is "precisely the type of agency to which deference should be presumptively afforded." *Id.* at 37, 102 S.Ct. at 45. The regulation at issue here was promulgated in 1979 and represents the agency's consistent interpretation of this provision.[6] *See Carter/Mondale,* 711 F.2d at 280. Thus, this regulation, like that reviewed by the Supreme Court in *DSCC,* merits this court's deference.

In sum, the regulation challenged here is neither contrary to the Commission's statutory authority, nor inconsistent with its purposes. In such circumstances, under *DSCC,* the Commission's construction is entitled to deference.

6. The regulation, contrary to the majority's suggestion, Maj.Op. at 1565, does not supplant the Act's criminal penalties, since those penalties are available only if the candidate willfully violates the spending ceilings. The regulation here would discourage nonwillful violations as well by stimulating more effective oversight of campaign committee expenditures in the first instance.