JOHN GLENN PRESIDENTIAL COMMITTEE, INC., Petitioner,

v.

FEDERAL ELECTION COMMISSION, Respondent.

No. 86–1348.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 20, 1987.

Decided June 23, 1987.

As Amended June 23, 1987.

Harlan Pomeroy, with whom Lee T. Ellis, Jr. and D. Brent Gunsalus, Washington, D.C., were on the brief, for petitioner.

Richard B. Bader, Asst. General Counsel, Federal Election Com'n, with whom Charles N. Steele, General Counsel and David I. Futter, Atty., Federal Election Com'n, Washington, D.C., were on the brief, for respondent.

Before RUTH BADER GINSBURG and BUCKLEY, Circuit Judges, and FAIRCHILD,[*] Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

The John Glenn Presidential Committee, Inc. (Glenn Committee) has invoked this court's authority to review a final repayment determination, rendered May 15, 1986, by the Federal Election Commission (FEC or Commission). *See* 26 U.S.C. § 9038(b)(2) and 11 C.F.R. § 9038.2 (Commission repayment determinations); 26 U.S.C. § 9041(a) (judicial review). The Glenn Committee received approximately $2,800,000 in federal matching payments under the Presidential Primary Matching Payment Account Act (Matching Payment Act), 26 U.S.C. §§ 9031–9042, for use in the 1984 presidential primary campaign; the contested Commission determination directs the Glenn Committee to repay $74,-955.62. This amount, according to the FEC's determination, represents the federal funds paid for campaign expenditures in Iowa and New Hampshire in excess of the state expenditure limits prescribed in the Federal Election Campaign Act, 2 U.S.C. § 441a(b)(1)(A) ("aggregate of expenditures ... in any one State shall not exceed the greater of 16 cents multiplied by the voting age population of the State ..., or $200,000"); *see id.* § 441a(c) (providing for upward adjustment of limits annually, based on average percentage rise in the consumer price index for the 12 preceding months).

The Glenn Committee initially resists repayment on the ground that the state, expenditure limits Congress ordered in 2 U.S.C. § 441a(b)(1)(A) are unconstitutional. The Committee also contests the FEC's determination on three specific items: a $120,000 telephone call expenditure the Commission allocated to Iowa; polling expenditures of $2,578.25 (allocated by the FEC to Iowa) and $64,284.56 (allocated by the FEC to New Hampshire); and button and bumper sticker expenditures of $6,415.72 (allocated by the FEC to Iowa) and $814.78 (allocated by the FEC to New Hampshire).

We affirm the Commission's final repayment determination. The Glenn Committee "is certainly correct when it states that ... the government may not deny a benefit to a person because he exercises a constitutional right." *Regan v. Taxation with Representation*, 461 U.S. 540, 545, 103 S.Ct. 1997, 2000, 76 L.Ed.2d 129 (1983). But this repayment determination case does not fit that description. The statutory recoupment remedy pursued by the FEC does not call back private spending; it does police the restrictions Congress placed on the expenditure of public moneys. Campaign speech within a state is surely activity sheltered by the Constitution. A ceiling on public subsidies for that activity, however, cannot be equated, under currently governing precedent, with a proscription of or a penalty on the activity. *See Taxation with Representation*, 461 U.S. at 545, 103 S.Ct. at 2000; *Harris v. McRae*, 448 U.S. 297, 317 n. 19, 100 S.Ct. 2671, 2688, n. 19, 65 L.Ed.2d 784 (1980). As to the claims that the FEC misapplied Commission regulations in three specific areas, we find in each instance that the FEC has ruled rationally and has not abused the authority Congress delegated to it.

I.

On October 6, 1983, the FEC determined that Senator John Glenn, having satisfied the requirements of 26 U.S.C. § 9033(a) and (b), and 11 C.F.R. §§ 9033.1, 9033.2, was eligible to receive payments from the Presidential Primary Matching Payment Account pursuant to 26 U.S.C. § 9037(b) and 11 C.F.R. § 9037.1. Under the Matching Payment Act prescription, 26 U.S.C. § 9034, a candidate whose eligibility is established is entitled to receive federal

[*] Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d).

funds to match individual contributions up to $250, subject to an overall ceiling of 50% of the expenditure limits stated in 2 U.S.C. § 441a(b)(1)(A). In 1984, the total (national) limit was $20.2 million (so that candidates could receive no more than $10.1 million in matching fund payments), the limit for New Hampshire was $404,000, and the limit for Iowa was $684,537.50.

Candidates may use the public funds they receive to help defray "qualified campaign expenses"; campaign expenses are not "qualified" if they exceed the limits Congress set, including the limits on spending in each state. 26 U.S.C. § 9035(a); *see Kennedy for President Committee v. FEC*, 734 F.2d 1558, 1560 n. 1 (D.C.Cir. 1984). The Matching Payment Act directs the FEC, after a nomination campaign ends, to conduct a thorough audit of the campaign finances of every publicly-funded candidate, 26 U.S.C. § 9038(a); if the Commission determines that matching fund payments were used for unqualified purposes, the Commission is to order repayment of the amount of matching funds— and *only* the amount of *matching funds* —so used. 26 U.S.C. § 9038(b)(2); *Kennedy for President Committee*, 734 F.2d at 1559, 1561 (holding that "the statute requires the Commission to make a reasonable determination of the amount of *matching funds* used for unqualified purposes, and to limit its repayment order to that amount") (emphasis in original).

On March 16, 1984, Senator Glenn announced he was no longer a candidate for the Democratic presidential nomination. After conducting the audit required by 26 U.S.C. § 9038(a), the FEC ultimately adopted its final repayment determination for the Glenn Committee. That decision, rendered May 15, 1986, states and explains the FEC's findings that the Committee's total expenditures for Iowa were $758,666.70, or $74,129.20 above the statutory ceiling for Iowa, and that total expenditures for New Hampshire were $577,-

831.77, or $173,831.71 above the New Hampshire ceiling. Joint Appendix at 30. Recognizing that the statute gives rise to a repayment obligation only as to the federal matching funds portion of expenditures above the ceilings, *see Kennedy for President Committee*, 734 F.2d at 1559, 1561, the FEC directed the Glenn Committee to repay $74,955.62. *See* 11 C.F.R. § 9038.-2(b)(2)(iii) (providing for repayment of that portion of nonqualified campaign expenses which equals the proportion of the candidate's total campaign funds made up of matching fund payments).

In addition to its first amendment challenge, the Glenn Committee, in its petition for court review, contests three of the Commission's findings. *See supra* pp. 1098–1099. We address the constitutional objection first, and next, the three specific allocation rulings the Glenn Committee questions.

## II.

The Glenn Committee "does not here question the constitutionality of the [Federal Election Campaign] Act's limitations on *total* expenditures made by candidates receiving public financing." Brief of Petitioner at 10 (emphasis in original); *see Buckley v. Valeo*, 424 U.S. 1, 57 n. 65, 96 S.Ct. 612, 653 n. 65, 46 L.Ed.2d 659 (1976) ("Congress may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations."); *Republican National Committee v. FEC*, 487 F.Supp. 280 (S.D.N.Y.) (three-judge court), 616 F.2d 1 (2d Cir.) (en banc), *aff'd mem.*, 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980) (upholding against first amendment challenge overall spending limitations prescribed for public financing of presidential candidates in general election). Rather, the Committee confines its attack to the state-by-state limitations.[1]

1. Based on the FEC's experience in administering the campaign financing legislation, the Commission itself has recommended to Congress and the President, in its two most recent Annual Reports, elimination of the state-by-state limits.

*See* Federal Election Commission Ann.Rep.1985 45–46 (1986); Federal Election Commission Ann.Rep.1986 48–49 (1987), cogently stating:

Our experience has shown that the limitations have little impact on campaign spending

The imposition that the Glenn Committee resists, this court has underscored, applies only to federal funds, not to private moneys, spent for unqualified purposes, *i.e.*, in excess of congressionally-prescribed limitations on spending in each state. *Kennedy for President Committee*, 734 F.2d at 1559, 1561, reiterates in text and notes this clear construction: the statute's repayment directive, 26 U.S.C. § 9038(b), allows the FEC to recoup only the public moneys—the matching funds—not the entire sum used for unqualified expenditures. And as the Supreme Court has recently restated, a legislature's decision not to subsidize the exercise of a fundamental right—a fortiori, a decision to place dollar limits on public subsidies—does not infringe that right. *Regan v. Taxation with Representation*, 461 U.S. at 545, 103 S.Ct. at 2001 (public interest organization's lobbying, though sheltered by first amendment, need not be subsidized by government); *Harris v. McRae*, 448 U.S. at 316, 317 n. 19, 100 S.Ct. at 2687, 2688 n. 19 (no constitutional entitlement to public funds for engaging in protected activity).

Significantly, the Glenn Committee states that this case entails "an inadvertent overshooting of the limitations." Brief of

Petitioner at 18. The FEC agrees; it has made simply and solely a repayment determination, one "not considered to involve violations of law." *See Reagan Bush Committee v. FEC*, 525 F.Supp. 1330, 1337 (D.D.C.1981). This court has observed that the Matching Payment Act does authorize the imposition of penalties "[w]hen a candidate knowingly and willfully violates the spending ceilings." *Kennedy for President Committee*, 734 F.2d at 1565 (citing 26 U.S.C. §§ 9035, 9042, also 2 U.S.C. § 437g). The parties have not cited, however, nor have we found any case in which the FEC sought to sanction a candidate for knowingly and willfully spending money (including private funds) in excess of state-by-state ceilings. We do not confront or anticipate such a case, and we express no judgment on the constitutionality of the statutory provisions in point, 26 U.S.C. §§ 9035, 9042, if construed to penalize state-by-state expenditures from nonpublic purses. *Cf. Buckley v. Valeo*, 424 U.S. at 54–59, 96 S.Ct. at 651–54.[2]

In sum, the FEC in this case has proceeded under a repayment determination provision, 26 U.S.C. § 9038(b)(2), that authorizes recoupment of federal funds and nothing more. We find no constitutional infirmity

in a given State, with the exception of Iowa and New Hampshire. In most other States, campaigns are unable or do not wish to expend an amount equal to the limitation. In effect, then, the administration of the entire program results in limiting disbursements in these two primaries alone.

If the limitations were removed, the level of disbursements in these States would obviously increase. With an increasing number of primaries vying for a campaign's limited resources, however, it would not be possible to spend very large amounts in these early primaries and still have adequate funds available for the later primaries. Thus, the overall national limit would serve as a constraint on State spending, even in the early primaries. At the same time, candidates would have broader discretion in the running of their campaigns.

Our experience has also shown that the limitations have been only partially successful in limiting expenditures in the early primary States. The use of the fundraising limitation, the compliance cost exemption, the volunteer service provisions, the unreimbursed personnel travel expense provisions, the use of a personal residence in volunteer activity ex-

emption, and a complex series of allocation schemes have developed into an art which when skillfully practiced can partially circumvent the State limitations.

Finally, the allocation of expenditures to the States has proven a significant accounting burden for campaigns and an equally difficult audit and enforcement task for the Commission.

Given our experience to date, we believe that this change to the Act would be of substantial benefit to all parties concerned.

It may be, as the FEC has indicated, that the state-by-state limits are unwise in principle and inordinately difficult to administer. The policy judgment, whether the limits should be deleted, however, is one no court is positioned to make.

**2.** *See also* Federal Election Campaign Act Amendments of 1974, S.Rep. No. 689, 93d Cong., 2d Sess. 10 (1974), *reprinted in* 1974 U.S. Code Cong. & Ad. News 5587, 5596:

Whether they qualify for public assistance and accept it, or not, all candidates are free to "do their own thing": to decide how they will conduct their campaign and employ their financial resources.

in the agency action taken by the FEC, the only action contestable in the Glenn Committee's petition for review.[3]

## III.

The Glenn Committee also questions the FEC's application of Commission regulations in three of the audit findings contributing to the repayment determination. By misapplying the FEC's own regulations, the Glenn Committee charges, the Commission has denied the Committee exemptions to which it is entitled by law. In reviewing the Glenn Committee's challenges to specific FEC allocation rulings, we are mindful that "it is not necessary for a court to find that the agency's construction [of the statute it administers] was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *FEC v. Democratic Senatorial Campaign Committee (DSCC)*, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981). Absent a clash with congressional intent, the expert agency's interpretation may be rejected by a court only if the agency's view is "unreasonable." *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The Supreme Court, we note, explicitly concluded in *DSCC* "that the [Federal Election] Commission is precisely the type of agency to which deference should presumptively be afforded." 454 U.S. at 37, 102 S.Ct. at 44. Surely no less deference is due the FEC's interpretation of its own regulations than of the statutes it has been entrusted to enforce. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) ("When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order."). With these admonitions in mind, we address each of the Glenn Committee's objections.

### Telephone Calls

The Glenn Committee engaged a communications services vendor to place calls from Kansas City, Missouri to voters in Iowa prior to the Iowa caucus. Relying upon a regulatory provision stating that "[e]xpenditures for telephone calls between two states need not be allocated to any State," 11 C.F.R. § 106.2(b)(2)(v)(B), the Committee allocated charges of $120,000 for these Missouri-Iowa calls to its national headquarters. The FEC reallocated this $120,000 sum to the Iowa campaign.

The FEC maintains that the regulatory provision cited by the Glenn Committee, read in context, does not permit shifting to national headquarters calls plainly geared to the campaign in a particular state. The regulations in question first provide that "expenditures incurred ... for the purpose of influencing the nomination of th[e] candidate for the office of President with respect to a particular State shall be allocated to that State." 11 C.F.R. § 106.2(a)(1). The regulations next deal with "expenditure[s] incurred ... for the purpose of influencing the nomination of th[e] candidate in more than one State." 11 C.F.R. § 106.-2(b)(1). Such expenditures shall be allocated among the states "on a reasonable and uniformly applied basis." *Id.* The provision on interstate telephone calls singled out by the Glenn Committee, 11 C.F.R. § 106.2(b)(2)(v)(B), the FEC explains, comes into play only when the expenditure is directed to attracting voters in more than one state, *see* 11 C.F.R. § 106.2(b), and not when the money is spent to gain voter support in one particular state, *see* 11 C.F.R. § 106.2(a). We cannot gainsay this

---

**3.** We note the provision for "actions for declaratory judgment ... to construe the constitutionality of any provision of th[e] [Federal Election Campaign] Act." 2 U.S.C. § 437h. Under that provision, "any individual eligible to vote in any election for the office of President may institute such [an] action[ ] in the appropriate district court [and that] court immediately shall certify all questions of constitutionality ... to the ... court of appeals for the circuit involved, which shall hear the matter sitting en banc." *Id.* § 437h(a). Court of appeals decisions in such matters "shall be reviewable by appeal directly to the Supreme Court." *Id.* § 437h(b). These extraordinary judicial review prescriptions might be used to test the validity of the 2 U.S.C. § 441a(b)(1)(A) state-by-state limits themselves, outside the context of a repayment determination decision, in which the only sum at issue is the federal contribution.

rational explanation of the thrust of the Commission's regulations.

The FEC found that the telephone call expenditure at issue "was demonstrably intended to promote Senator Glenn's candidacy in Iowa." Joint Appendix at 18. The Glenn Committee concedes that all the calls in question were made to voters in Iowa. Brief of Petitioner at 19. Because Iowa voters alone were the objectives of the $120,000 expenditure, the Commission reasonably concluded that the governing prescription was contained in 11 C.F.R. § 106.-2(a)(1) (expenditures with respect to a particular state), rather than in 11 C.F.R. § 106.2(b) (expenditures to influence candidate's nomination in more than one state).

*Public Opinion Polls*

■ The Glenn Committee's challenge regarding public opinion polling expenditures concerns several polls or surveys conducted for the Committee by Maryland and New York vendors. Three of these polls were conducted exclusively in New Hampshire; four were conducted in Iowa and/or New Hampshire and four or fewer other states.[4] The Committee allocated no part of the costs of the three polls conducted exclusively in New Hampshire to that state; the Commission, in contrast, attributed the full cost of these polls to New Hampshire. The Committee had allocated the costs of only two of the four multistate polls to the states polled; the Commission reallocated the total cost of each of these four polls in proportion to the number of people interviewed in each state. The Commission thus reallocated polling expenditures of $2,578.25 to Iowa and $64,284.56 to New Hampshire. *See* Joint Appendix at 15, 48–53. In its petition for review, the Glenn Committee contests only the FEC's reallocations for the multi-state polls, spe-

cifically, $2,578.25 to Iowa and $8,438.38 to New Hampshire.

The Glenn Committee asserts that the polls in question were conducted to gather information to aid in planning nationwide strategy, so that the outlays at issue fall within the FEC's regulation providing: "Expenditures incurred for the taking of a public opinion poll which is conducted on a nationwide basis need not be allocated to any State." 11 C.F.R. § 106.2(c)(1)(iii). The FEC reads the cited provision, 11 C.F.R. § 106.2(c)(1)(iii), differently. In the Commission's view, the prescription governs "only polls testing nationwide opinion that cannot easily be connected to any particular primary election." Brief for Respondent at 22. Polls of early primary states, the FEC maintains, even if useful in formulating national campaign strategy, are not "conducted on a nationwide basis." *See* 11 C.F.R. § 106.2(c)(1)(iii). Instead, according to the Commission, "such narrow polls," Brief for Respondent at 22, fit within the prescription of 11 C.F.R. § 106.-2(b)(2)(vi) that "expenditures incurred for the taking of a public opinion poll covering two or more States shall be allocated to those States based on the number of people interviewed in each State."[5] Both the Glenn Committee and the FEC, we conclude, tender plausible readings of the words in 11 C.F.R. § 106.2(c)(1)(iii) "conducted on a nationwide basis." We are bound, when alternative constructions are thus sensible, to defer to the Commission's interpretation. *See DSCC*, 454 U.S. at 39, 102 S.Ct. at 47.

Nor have we any cause to doubt that the FEC, under its reading of the regulations, properly labeled the four polls at stake "multi-state" rather than "nationwide." The Commission observed that the Glenn Committee did not "deny that the surveys

4. *See* Joint Appendix at 48–51. The areas covered in the four multi-state polls were: (1) Iowa, New Hampshire, Alabama, and three midwest counties in three different states; (2) Iowa, New Hampshire, Georgia, Alabama, and Florida; (3) New Hampshire, Florida, Alabama, and Georgia; and (4) Iowa, New Hampshire, and Massachusetts.

5. In full, 11 C.F.R. § 106.2(b)(2)(vi) reads:

(vi) **Public opinion poll expenditures.** Expenditures incurred for the taking of a public opinion poll covering only one State shall be allocated to that State. Except for expenditures incurred in conducting a nationwide poll, expenditures incurred for the taking of a public opinion poll covering two or more States shall be allocated to those States based on the number of people interviewed in each State.

were conducted only in early caucus or primary states." Joint Appendix at 16. Furthermore, none of the four polls in question involved more than six states or any state in the western half of the United States. *See* Brief for Respondent at 21. In addition, the Glenn Committee itself had allocated in some fashion among the states surveyed the costs of two of the polls in contention. *See* Joint Appendix at 52.[6] This allocation shows some recognition by the Committee that the polls involved did not qualify as "nationwide." Taking these factors into account, we are satisfied that the FEC reasonably construed and applied its polling regulations to the matter at hand.

*Buttons and Bumper Stickers*

A North Carolina vendor made campaign buttons and bumper stickers for the Glenn Committee and shipped them to several states. The Committee charged the entire expenditure to its national headquarters, but the FEC allocated the cost among the states in proportion to the number of items originally shipped to a state. The allocations relevant here were $6,415.72 to Iowa, and $814.78 to New Hampshire. The Glenn Committee asserts that many of the buttons and stickers were not used in the states to which they were initially shipped and were subsequently reshipped to southern primary states. Although the Committee kept no records of the reshipments, it contends that a one-third reduction in the Iowa and New Hampshire allocations would be a fair adjustment.

The Glenn Committee's plea is plausible, but not proved. To support the requested reduction, the Committee submitted to the FEC a sole document—a one-sentence affidavit, signed by a person whose relationship to the campaign was not stated,[7] asserting: "It was common knowledge that the undistributed buttons in New Hampshire were sent to the southern states for use prior to Super Tuesday." Joint Appendix at 62. The affidavit purports to convey "common," not personal knowledge; it says nothing about bumper stickers, and nothing at all about Iowa.

On brief, the FEC observed that "an estimate might be appropriate if there were probative evidence that a substantial number of [buttons and stickers] had in fact been shipped, but no record of the exact amount." Brief for Respondent at 20; *see also id.* at 18 (Committee might have presented affidavits of persons who either participated in reshipping items or received reshipped items). But the Glenn Committee offered nothing the Commission could use as a foundation for an estimate. Given these circumstances, the FEC's refusal to reduce the Iowa and New Hampshire button and sticker allocations can hardly be termed arbitrary or irrational.

CONCLUSION

For the reasons stated, we affirm the FEC's final repayment determination.

*It is so ordered.*

---

6. In lieu of allocating the cost among the states "based on the number of people interviewed in each State," 11 C.F.R. § 106.2(b)(vi), the Committee had simply divided the cost evenly among the several states involved in the poll. *See* Joint Appendix at 48–49.

7. In its brief on appeal, the Glenn Committee identified the affiant as Deputy Controller of the Committee. Brief of Petitioner at 26.