**BUSH–QUAYLE '92 PRIMARY COMMITTEE, INC., et al.,**
**Petitioners**

v.

**FEDERAL ELECTION COMMISSION,**
**Respondent.**

**Nos. 95–1430, 95–1431 and 95–1432.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 31, 1996.

Decided Jan. 14, 1997.

Bobby R. Burchfield argued the cause for petitioners, with whom Thomas O. Barnett was on the briefs.

Richard B. Bader, Associate General Counsel, Federal Election Commission, argued the cause for respondent, with whom Lawrence M. Noble, General Counsel, and Vivien Clair, Attorney, were on the brief.

Before WALD, SENTELLE and ROGERS, Circuit Judges.

SENTELLE, Circuit Judge:

This petition seeks review of a Federal Election Commission ("FEC" or "Commission") decision requiring the Bush–Quayle '92 Primary Committee to repay federal matching funds made pursuant to the Presidential Primary Matching Payment Account Act, 26 U.S.C. §§ 9031–9042 ("Matching Payment Act"). Petitioners argue that the Commission's repayment determination is inconsistent with the statute and regulations and that the Commission has not adequately explained its departure from precedent. After review of the agency record we agree that the Commission has failed to justify its departure from precedent. We therefore remand the case to the Commission to justify or remedy the departure.

I.

The Matching Payment Act was enacted in 1974 to provide partial public funding to the campaigns of qualified presidential primary candidates. 26 U.S.C. §§ 9031–9042. An eligible candidate is entitled to receive payments matching individual contributions of up to $250, subject to an overall ceiling. 26 U.S.C. § 9034(a), (b). As a condition to receiving the funds, the candidate must agree

to limit expenditures to "qualified campaign expenses," defined as expenses incurred by the candidate "in connection with his campaign for nomination" that do not violate state or federal law. 26 U.S.C. § 9032(9)(A).

The Matching Payment Act instructs the Commission to conduct an audit of the campaign finances of every publicly funded campaign after the campaign for nomination ends. 26 U.S.C. § 9038(a). If the Commission's audit reveals that public funds have been spent on non-qualified expenses, the candidate is required to repay to the Treasury the portion of non-qualified campaign expenses attributable to public funds. 26 U.S.C. § 9038(b)(2); 11 C.F.R. § 9038.2(b)(2)(iii). Moreover, if the Commission determines that "any portion of the payments made to a candidate from the matching payment account was in excess of the aggregate amount of payments to which [the] candidate was entitled under section 9034, it shall notify the candidate, and the candidate shall pay to the Secretary an amount equal to the amount of excess payments." 26 U.S.C. § 9038(b)(1).

If a candidate becomes eligible for the general election, the candidate may obtain additional federal funds under the Presidential Election Campaign Fund Act, 26 U.S.C. §§ 9001–9013 ("Fund Act"). The Fund Act requires that candidates not accept private campaign contributions and "not incur qualified campaign expenses in excess of the limitations of the aggregate payments to which they will be entitled." 26 U.S.C. §§ 9002, 9003(b)(1), (b)(2). Like the Matching Payment Act, the Fund Act directs the Commission to conduct a post-election audit. 26 U.S.C. § 9007(a).

This case arises from Commission audits of the 1992 campaign of President George Bush. During the 1992 primary campaign, $10,658,521 in public funds were deposited into the account of the Bush–Quayle '92 Primary Committee under the Matching Payment Act. After President Bush received the Republican nomination on August 20, 1992, the Bush–Quayle '92 General Committee received $55,240,000 in public funds for the general election campaign. At the conclusion of the race, the Commission conduct-

ed an audit of the finances of the Bush–Quayle '92 Primary Committee, the Bush–Quayle '92 General Committee, and the legal and accounting arm of the general election campaign, the Bush–Quayle '92 Compliance Committee. At that time the process for determining whether repayment was required was as follows: Under the regulations, the audit staff would first issue an Interim Audit Report that recommended an amount for repayment. 11 C.F.R. § 9038.1(c)(1). After considering any objections raised to the Interim Audit Report by the candidate, the Commission adopted a Final Audit Report that made an "initial repayment determination." 11 C.F.R. § 9038.2(c)(1). The candidate could submit evidence that the repayment determination was erroneous and could also request an oral hearing. 11 C.F.R. § 9038.2(c)(3).The Commission then issued a final repayment determination with an accompanying statement of reasons. 11 C.F.R. § 9038.2(c)(4).

The Commission audit staff issued Interim Audit Reports on the Committees on March 24, 1994, to which the Committees responded in writing. On December 27, 1994, the Commission approved Final Audit Reports and made initial repayment determinations. Consistent with the conclusions of the staff, the Commission determined that a number of expenses incurred by the Primary Committee were not "qualified campaign expenses" because they were made for the benefit of the general election campaign. Among the problematic disbursements were expenses for polling, focus group surveys, direct mail, list rental, shipping, print media services, leased office space, and equipment. Although these expenses were made prior to August 20, 1992, the day on which President Bush received the Republican nomination, the Commission concluded that they were non-qualified because they benefitted the general election campaign. For instance, one mailing contrasted the records of George Bush and Bill Clinton. Similarly, a letter from Marilyn Quayle compared Clinton and Bush and urged voters to "make the difference in November." Although the Commission agreed with the staff that these expenses could not be allocated entirely to the

Primary Committee, the Commission partly revised the audit staff's repayment determination. While the staff had recommended allocating the expenses entirely to the General Committee, the Commission determined that the expenses had mixed purposes of benefitting both the general election and the primary campaign. It therefore determined that one-half of the expenses could be allocated to the Primary Committee. The remaining one-half was assigned to the General Committee and subject to reimbursement.

The Committees challenged the Final Audit Reports arguing that the Commission should use a "bright-line" rule in allocating expenses based on whether the expenses were incurred before or after August 20, 1992. The Committees also argued that, even without a bright-line rule, the challenged expenditures were made "in connection with" the primary campaign.

Following an oral presentation, the Commission issued a final repayment determination requiring the Primary Committee to repay $323,832 to the United States Treasury. In the accompanying statement of reasons, the Commission rejected the bright-line approach, stating that "whether an expenditure is a primary qualified expenditure relies on both the timing of the expenditure and the nature of the expenditure." Statement of Reasons at 19, *reprinted in* Joint Appendix ("J.A.") at 1256. The Commission assigned certain expenses to the Primary Committee, but concluded that $818,246 of expenditures were related to the general election campaign. The Committee applied the 50/50 approach and determined that $409,123 in campaign expenses were non-qualified. Approximately 26% of the Committee's funds were public, leaving $106,979 as the Primary Committee's pro rata share of non-qualified campaign expenses. The Commission also found that the Primary Committee had received $216,853 in funds in excess of its entitlement which was subject to repayment.

The Commission stated that it was not requiring further payment from the General Committee or the Compliance Committee. The Commission found, however, that based on the reassignment of expenses from the Primary Committee to the General Committee the General Committee had exceeded its expenditure limit by $182,785. The Commission therefore "recommended" that the Compliance Fund reimburse $182,785 to the General Committee to eliminate the expenditures in excess of its overall expenditure limitation.

## II.

As a preliminary matter, we must dispose of the Commission's argument that the petitions of the General Committee and the Compliance Committee should be dismissed for lack of standing. In order to establish constitutional standing, a litigant must demonstrate an injury in fact that is fairly traceable to the challenged action of the defendant and redressable by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992). The Commission argues that the General Committee and the Compliance Committee have not suffered an injury in fact sufficient to meet the requirements of Article III. We reject this argument and decline to dismiss the petitions. Based on its determination that the amounts in issue ought to have been allocated to the general election, the Commission concluded that the General Committee had exceeded its overall expenditure limitation by $182,785. The violation of federal election laws presupposed by this conclusion may be remedied only if the General Committee's legal and accounting arm, the Compliance Committee, raises funds to reimburse the Treasury. The repayment obligations of the General Committee and the Compliance Committee are, therefore, implicit in the Commission's findings with regard to the Primary Committee. We hold that these repayment obligations are sufficient injury in fact for purposes of Article III.

We turn to the merits of the dispute. The Committees argue that the Commission's decision to allocate pre-August 20 expenditures to the General Committee is barred by both the Matching Payment Act and the Commission's regulations interpreting the Act which state that an expenditure will be a qualified campaign expense if it is made "in connection with" a candidate's campaign for nomination and does not violate state or federal law. 26

U.S.C. § 9032(9); 11 C.F.R. § 9032.9. The Committees argue that because neither the statute nor the regulations require that expenditures be made *exclusively* "in connection with" the campaign, any connection with the primary campaign qualifies the expenditure.

■ The first question raised by this claim is whether this court must defer to the agency's interpretation of the statute and regulations. Under the familiar rule of *Chevron*, courts accord deference to an agency's interpretation of a statute it administers. *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Where statutory language is ambiguous, the agency's interpretation is adopted so long as it is reasonable. *Id.* at 845, 104 S.Ct. at 2783. As the Supreme Court has instructed, "it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). The call for deference is even greater where the agency is interpreting its own regulations. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Capital Network Sys., Inc. v. FCC*, 28 F.3d 201, 206 (D.C.Cir.1994).

Petitioners argue that *Chevron* does not apply where First Amendment rights are implicated. *See Chamber of Commerce v. FEC*, 69 F.3d 600, 605 (D.C.Cir.1995). However, our holding declining to apply *Chevron* in *Chamber of Commerce* does not preclude its application in all First Amendment contexts. *See LaRouche v. FEC*, 28 F.3d 137, 140–41 (D.C.Cir.1994); *John Glenn Presidential Comm., Inc. v. FEC*, 822 F.2d 1097, 1101 (D.C.Cir.1987). *Chamber of Commerce* involved a challenge by nonprofit corporations to an FEC regulation limiting the corporations' ability to convey political messages and solicitations. The Federal Election Campaign Act prohibits corporations and labor organizations from making contributions or expenditures in connection with an election, but it allows these organizations to solicit contributions from "members." At issue

in *Chamber of Commerce* was the proper interpretation of the term "member." *Chamber of Commerce*, 69 F.3d at 601.

■ Too restrictive an interpretation of the term would have prevented the organizations from communicating on political subjects with thousands of persons and would have burdened the organizations' First Amendment rights. *Id.* at 605. We therefore invoked the well established rule of statutory construction that "[w]e are obliged to construe [a] statute to avoid constitutional difficulties if such a construction is not plainly contrary to the intent of Congress." *Id.* (citing *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988); *Bell Atlantic Tel. Co. v. FCC*, 24 F.3d 1441, 1445 (D.C.Cir.1994)). The repayment determination at issue in this case, however, does not raise a constitutional problem. Therefore we need not apply this rule of statutory construction.

■ Although this case concerns political speech and, in that sense, implicates the First Amendment, the very nature of the FEC dictates that all Commission determinations will touch upon political speech. Courts are not, however, prohibited as a matter of course from applying *Chevron* to FEC determinations. *See LaRouche*, 28 F.3d at 140–41; *John Glenn*, 822 F.2d at 1101. In fact, the Supreme Court has explicitly noted that the FEC "is precisely the type of agency to which deference should presumptively be afforded." *Democratic Senatorial Campaign Comm.*, 454 U.S. at 37, 102 S.Ct. at 45. Petitioners argue that too restrictive an interpretation of the statute would prevent a candidate from engaging in certain political speech. In fact, a restrictive interpretation would mean only that the candidate could not depend on public funds to subsidize that speech. As both the Supreme Court and this court have recognized, a legislative decision not to subsidize the exercise of First Amendment rights does not infringe upon the First Amendment. *Regan v. Taxation with Representation*, 461 U.S. 540, 545, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983); *John Glenn*, 822 F.2d at 1100.

Therefore, with the principles of *Chevron* in mind, we address petitioners' claim that the Commission's repayment determination is inconsistent with the statute and the regulations. The statute provides:

The term "qualified campaign expense" means a purchase, payment, distribution, loan, advance, deposit, or gift of money or of anything of value—

(A) incurred by a candidate, or by his or her authorized committee, in connection with his campaign for nomination for election, and

(B) neither the incurring nor payment of which constitutes a violation of any law of the United States or of the State in which the expense is incurred or paid.

26 U.S.C. § 9032(9). In addition, the Commission has adopted a body of regulations relating to primary matching funds. Like the Matching Payment Act on which they were based, the regulations in effect in 1992 defined "qualified campaign expense" to be one made "in connection with" a campaign for nomination and not in violation of state or federal law. 11 C.F.R. § 9032.9.

The Committees maintain that the language "in connection with" does not require that an expenditure be exclusively related to the primary campaign. Under the Committees' reading of the statute, any connection with the primary will qualify an expense. The Committee believes, therefore, that expenditures with mixed purposes are qualified primary campaign expenses. In contrast, the Commission asserts that "[t]o be 'in connection with' the primary campaign, a qualified campaign expenditure must be primarily related to the primary campaign." Statement of Reasons at 19, *reprinted in* J.A. at 1256.

██ Both readings of the language "in connection with" are tenable. The requirement of a "connection" may denote a direct and integral relationship, as the Commission holds, or the more tenuous association petitioners suggest. When confronted with alternative sensible readings of an ambiguous statute the court is directed by *Chevron* to adopt the one the agency presents. 467 U.S. at 844, 104 S.Ct. at 2782. As we note above, the case for deference is even stronger when

the agency is interpreting its own regulations. *Udall*, 380 U.S. at 16, 85 S.Ct. at 801; *Capital Network Sys., Inc.*, 28 F.3d at 206. Therefore, nothing else appearing, we would uphold the agency's interpretation of "in connection with" as requiring a primary purpose of benefitting the campaign for nomination.

██ But petitioners raise another objection to the Commission's decision that warrants further consideration. They argue that the Commission has acted arbitrarily and capriciously in affording different treatment to their expenditures than it did to the similar acts of President Reagan's 1984 primary campaign. Our *Chevron* analysis does not dispose of this claim. An agency interpretation that would otherwise be permissible is, nevertheless, prohibited when the agency has failed to explain its departure from prior precedent. *See Interstate Quality Servs., Inc. v. RRB*, 83 F.3d 1463, 1465 (D.C.Cir. 1996); *ANR Pipeline Co. v. FERC*, 870 F.2d 717, 723 (D.C.Cir.1989); *Greater Boston Tel. Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.), *cert denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

We have held, "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute." *Greater Boston*, 444 F.2d at 852. Petitioners argue that in the 1984 Reagan–Bush audit the Commission held that all pre-nomination expenditures were made "in connection with" the campaign for nomination despite the fact that some of the expenditures were found to have benefitted the general election campaign. Report of the Audit Division on Reagan–Bush at 7, *reprinted in* J.A. at 626. Petitioners raised the issue of the Reagan–Bush audit before the Commission which replied:

In the Reagan Bush audit, the Commission concluded that certain specific expenditures for polling, consulting, and voter registration incurred prior to the candidate's date of ineligibility that appeared to bene-

fit the general election campaign could be considered qualified campaign expenses of the Reagan Bush Primary Committee. Contrary to the Committees' assertion, the Commission did not adopt a "bright line" test in that case; rather, this precedent supports examining all of the particular facts surrounding an expenditure to determine whether it was "in connection with" the primary election.

Statement of Reasons at 20, *reprinted in* J.A. at 1256.

This discussion "glosses over" precedent and is essentially a bare assertion that the two cases are different. Without adequate elucidation, this court has no way of ascertaining whether cases are indeed distinguishable, whether the Commission has a principled reason for distinguishing them, or whether the Commission is refusing to treat like cases alike. In the Reagan–Bush audit, the Commission was confronted with expenditures with mixed purposes and determined that the expenditures were entirely qualified. When faced with mixed purposes in this case the Commission allocated part of the expense to the General Committee, stating "[a] portion of an expenditure could be qualified and a portion non-qualified if the purpose of an expenditure is mixed." Statement of Reasons at 19–20, *reprinted in* J.A. at 1256. The Commission explains the different treatment by stating only that it is necessary to examine the "particular facts." *Id.* However, the Commission fails to provide any hint of what facts or circumstances justify the departure.

We may permit agency action to stand without elaborate explanation where distinctions between the case under review and the asserted precedent are so plain that no inconsistency appears. That is not a violation of the principle of requiring explanation for departure from precedent. Rather, it is an application of the equally important principle of *Greater Boston* that:

> If satisfied that the agency has taken a hard look at the issues with the use of reasons and standards, the court will uphold its findings, though of less than ideal clarity, if the agency's path may reasonably be discerned, though of course the

court must not be left to guess as to the agency's findings or reasons.

*Greater Boston*, 444 F.2d at 851. For instance, in *Hall v. McLaughlin*, 864 F.2d 868, 872–73 (D.C.Cir.1989), we held that an involved explanation was not required where a Labor Department rule did not appear to be inconsistent with prior labor certification decisions. We relied on two additional cases holding that the circumstances of a prior agency decision were sufficiently different that the agency was entitled not to follow them even without a detailed explanation. *See United Mun. Distributors Group ·v. FERC*, 732 F.2d 202 (D.C.Cir.1984) (holding that FERC precedent was readily distinguishable and did not require elaborate discussion); *West Coast Media, Inc. v. FCC*, 695 F.2d 617 (D.C.Cir.), *cert denied*, 464 U.S. 816, 104 S.Ct. 74, 78 L.Ed.2d 87 (1983) (upholding an FCC decision that merely recited the factual differences between the prior case and the one before it).

However, *Hall* has no application to this case. No immediately obvious differences between the case before us and Reagan–Bush spring to mind. In fact, the nature of the expenditures appears to be quite similar. In both cases, the committees justified mixed purpose expenditures as necessary to convince primary voters that the candidate would be viable in the general election. The Commission's cursory treatment of seemingly relevant precedent is inadequate. We have stated previously:

> While here the agency's vice was not complete inattention to its prior policies, its discussion is so perplexing as to sow doubt whether this is a process of reasoned policy making, with a change in direction put in effect for a navigational objective, or the confusion of an agency that is rudderless and adrift.

*Public Serv. Comm'n for the State of New York v. FPC*, 511 F.2d 338, 353 (D.C.Cir. 1975). We also note that the Commission's determination is especially problematic given that it adopted new regulations two months before making its decision in this case and inexplicably declined to apply them to the Bush–Quayle audit. *See* 11 C.F.R. § 9034.4. The new regulations apply bright-line rules

under which many of the expenditures challenged here would have been qualified. *Id.* In adopting the new regulations, the Commission noted that a bright-line approach would "give committees clear guidance as to which expenses will be attributed to the primary election and which to the general election." 60 Fed.Reg. 31866 (1996). The Commission also recognized the need to avoid a "'case-by-case' determination of how certain expenditures should be characterized." *Id.* These comments suggest that the Commission recognized that its application of the statute prior to adoption of these regulations may have been ad hoc. The Commission does not make it clear why, in this situation, it opted not to apply its bright-line rule to petitioners.

Remand will permit the Commission to justify its approach or to reconsider its repayment determination. If the Commission chooses to provide a more detailed explanation, we can then ascertain whether some principled reason exists for distinguishing between the cases or whether the decision of whether an expenditure is qualified has been so subjective as to be arbitrary and capricious.

Until we have a more adequate discussion from the Commission of the departure from the approach used in Reagan–Bush, it would be imprudent to address petitioners' claim that they suffered a due process violation from lack of notice. We therefore decline to address this claim at this time.

For the foregoing reasons, we grant the petition for review.